UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                           Case No. 6:24-cr-40-RBD-EJK

KAREAM AKTON MOORE,

    Defendant.
_____/

## SENTENCING MEMORANDUM

Kaream Moore submits this sentencing memorandum for this Honorable Court's consideration.

## STATEMENT OF FACTS

On July 1, 2024, Mr. Moore pled guilty to conspiracy to distribute fentanyl in violation of 21 U.S.C. §§ 841, 846. Based on offense level 21 and criminal history category III, the advisory guideline range is 46 to 57 months. Because a minimum mandatory sentence of five years applies, Mr. Moore is facing a 60-month sentence. *See* PSR at ¶ 95. As this memorandum demonstrates, a 60-month mandatory sentence is the product of a flawed legal regime and a Department of Justice which has lost its purpose and way.

## ARGUMENT

### Chapter I
### Offense Conduct

*When people think about miscarriages of justice, they generally think big, especially in this era of DNA exonerations, in which wholly*

> *innocent people have been released from jail in significant numbers after long periods in prison. As disturbing as those cases are, the truth is that most of the time miscarriages of justice occur in small doses, in cases involving guilty defendants. This makes them easier to overlook. But when they are multiplied by the thousands of cases in which they occur, they have a greater impact on our criminal justice system than the cases you read about in the newspapers or hear about on 60 Minutes. This case is a good example.*
>
> *United States v. Vasquez,* No. 09-cr-259, 2010 WL 1257359, at *3 (E.D.N.Y. Mar. 30, 2010)(Gleeson, J.).

Suffering from a serious drug addiction for some 30 years, Mr. Moore's life had been marked by homelessness, poverty and failure. At the time of his arrest, Moore was living in the woods behind an apartment complex in Brevard County. Dot Winthrop, a tenant of the complex, took pity on Moore and often fed him, clothed him and paid him to do odd jobs.

At the time of his arrest, Moore was destitute and homeless, a social outcast and most of all a recalcitrant drug addict. Nevertheless, he was not a drug dealer, and he certainly was no drug kingpin – the type of serious criminal that our harsh federal drug laws were designed to address. *See Vasquez,* 2010 WL 1257359 at *3 ("If they want to, prosecutors can decide that street-level defendants [like the Defendant]-the low-hanging fruit for law enforcement-must receive the harsh sentences that Congress intended for kingpins and managers, no matter how many other factors weigh in favor of less severe sentences").

Considering Moore's marginal existence, the essential question is how did he arrive at this point – in a county jail cell, facing the unforgiving machinery of

the federal government. Unfortunately, the indictment provides little insight. Instead, its description of Moore's crime ultimately obscures the truth regarding his conduct.

Although the indictment alleges an organized and ongoing conspiracy between Moore, Tyrone Green, Clifford Walton, and Tirell Jordan from May 3, 2023, through August 10, 2023, this depiction overstates Moore's actual conduct. Moore's criminal act was a single event that occurred on a single day. Prior to August 10, 2023, Moore did not know Walton, Jordan, or Green. On that day, Dot Winthrop agreed to pay Moore $20 to clean up the area outside her apartment door. While he was cleaning, Green, who was at the apartment complex for a haircut, offered Moore another $30 to drop off a package to the confidential informant (CI); Moore rode a bicycle to the meeting point and handed a clear plastic baggy of drugs to the CI. PSR at ¶ 30-31. When the CI asked whether the baggy contained one or two ounces of drugs, Moore replied that did not know since "he was just told to make the delivery." *Id.* at. ¶ 31.[1] Although Moore falls far short of being the Pablo Escobar of Brevard, the Government, with all its idle discretion and reckless self-righteousness, now believes that the Defendant should be

---

[1] The Indictment, as parroted by the PSR, tells a tale of sound and fury, signifying nothing. *See* William Shakespeare, *Macbeth*, Act 5, Scene 5, 19-28 (1603)("Life's but a walking shadow, a poor player, that struts and frets his hour upon the stage, and then is heard no more. It is a tale . . . full of sound and fury, signifying nothing").

3

imprisoned for five years.

## Chapter II
## History and Characteristics

*"If I am the chief of sinners, I am the chief of sufferers also"*

Robert Louis Stevenson, *The Strange Case of Dr. Jekyll and Mr. Hyde,* (Longman, Green & Co 1886)

An analysis of Mr. Moore's criminal conduct indicates that his arrest was preordained -- the expected result of a life rooted in despair and ravaged by drugs. Although Mr. Moore did not know the baggy he delivered that day contained fentanyl, he certainly knew it contained drugs. Moore's understanding stemmed from his status as drug user for thirty years. *See* PSR at ¶ 81 (noting that Moore has been using drugs since age 13 and has been a daily crack user for the last ten years). Not surprisingly, based on his long-standing drug addiction, Mr. Moore's history is littered with a series of ignominious crimes – petty theft, shoplifting, drug possession, and larceny. *See id.* at ¶¶53-64. Exasperated with his long-standing drug abuse, Moore's father and sister essentially contend that he could have had a better life if he would "just say no" to drugs. PSR at ¶ 76. While this sentiment is comprehensible and undoubtably born out of years of frustration, it reflects a naive understanding of their son and brother's drug problem and its impact on his ability to make free and rationale choices.

Indeed, "[w]hile '[t]he initial decision to take drugs is mostly voluntary ... when drug abuse takes over, a person's ability to exert self-control can become

4

seriously impaired.' ... Stated plainly, addiction biologically robs drug abusers of their judgment, causing them to act impulsively and ignore the future consequences of their actions." *United States v. Hendrickson*, 25 F.Supp.3d 1166, 1172–73 (N.D. Iowa 2014) (quoting Nora D. Volkow, *Preface* to National Institute on Drug Abuse, Drugs, Brains, and Behavior: The Science of Addiction 1 (2010)). As *Hendrickson,* 25 F.Supp.3d at 1172-73, further explained:

> By physically hijacking the brain, addiction diminishes the addict's capacity to evaluate and control his or her behaviors. Rather than rationally assessing the costs of their actions, addicts are prone to act impulsively, without accurately weighing future consequences.

Stating that Mr. Moore's drug addiction contributed to his crimes is not particularly mitigating unless one comprehends that the Defendant's habit was a manifestation of mental illness – a disorder that overtook both his judgment and will. Indeed, while addiction has often been viewed as the result of a lack of willpower and character, narcotic dependence is a form of mental illness.[2] As such, it mitigates the crime and punishment to ensue. *See United States v. Mosley*, 277 F. Supp. 3d 1294, 1298 (N.D. Ala. 2017)("Given what substance abuse does to the brain, the court is unwilling simply to chalk up Mosley's difficulties to a character

---

[2] For nearly 100 years, the United States Supreme Court has recognized addiction as a medical disease. *See Linder v. United States,* 268 U.S. 5, 18 (1925) (noting that addicts "are diseased and proper subjects for [medical] treatment"); *see also Robinson v. California,* 370 U.S. 660, 667 (1962). The scientific research confirms that "[drug addiction] is considered a brain disease because drugs change the brain—they change its structure and how it works." *United States v. Hendrickson*, 25 F.Supp.3d 1166, 1172 (N.D. Iowa 2014).

5

flaw and lock him away, at least without first giving proper weight to whether and how that mental disorder affects his culpability for his conduct").[3]

As *Mosely* points out, the American Psychiatric Association's Diagnostic and Statistical Manual–V ("DSM–V") consider substance use disorders as a class of mental disorder like Schizophrenia, Bipolar Disorders, and Depression.[4] *See id*. Drug addiction is a mental illness "because addiction changes the brain in fundamental ways, disturbing a person's normal hierarchy of needs and desires and substituting new priorities connected with procuring and using the drug."[5]

The resulting compulsive behaviors that override the ability to control impulses despite the consequences are similar to the hallmarks of other mental illnesses. National Institute on Drug Abuse, *Is Drug Addiction a Mental Illness?* https://www.drugabuse.gov/publications/research-reports/comorbidity-addiction-other-mental-illnesses/drug-addiction-mental-illness (last visited Feb.

---

[3] *See also United States v. Walker*, 252 F.Supp.3d 1269 (D. Utah 2017)(finding that defendant's long-standing addiction was a mitigating factor); *Hendrickson*, 25 F.Supp.3d at 1172–73 (same); *United States v. Cani*, 545 F.Supp. 2d 1235 (M.D. Fla. 2008)(Conway, J.)(departing downward to 60 months imprisonment from guideline range of 262 to 327 months based in part on Defendant's heroin addiction).

[4] According to the DSM–V a 'mental disorder' is "a syndrome characterized by clinically significant disturbance in an individual's cognition, emotion regulation, or behavior that reflects a dysfunction in the psychological, biological, or developmental processes underlying mental functioning." DSM-V at 20.

[5] As one famous addict stated, "[i]f you have never been addicted, you have no clear idea what it means to need junk with the addict's special need. You don't decide to be an addict. One morning you wake up sick and you're an addict."  William Burroughs, *Junky,* prologue p. xxxviii (Ace Books 1953).

7, 2022).[6]

Although committing a crime to support due to a nefarious habit does not provide a legitimate justification, the fact that Mr. Moore's crime resulted from a mental illness, which impacted both his judgment and will, does mitigate his culpability. *See id.; Mosley*, 277 F.3d at 1298. Rather than seeing Moore as the sufferer he was, the Government only sees a sinner who deserves to be caged for the next 5 years. Thirty dollars never bought so little.

## Chapter 3
## Just Punishment

*"All in all, punishment hardens and renders people more insensible; it concentrates; it increases the feeling of estrangement; it strengthens the power of resistance."*

Friedrich Nietzsche, *The Genealogy of Morals*, essay 2, aph. 14 (1887)

Mr. Moore, an impoverished homeless drug addict who dropped off a baggie for $30, is now facing a mandatory sentence of five years (or 43,800 hours). And because of Congressional mandates, its sycophantic Sentencing Commission and

---

[6] Consistent with the finding of the National Institute of Drug Abuse, the DSM–V states:

> An important characteristic of substance use disorders is an underlying change in brain circuits that may persist beyond detoxification, particularly in individuals with severe disorders. The behavioral effects of these brain changes may be exhibited in the repeated relapses and intense drug craving when the individuals are exposed to drug-related stimuli. These persistent drug effects may benefit from long-term approaches to treatment.

DSM–V at 483.

an intolerant Justic Department, we are supposed to accept that such an irrational sentence constitutes just punishment. It is indeed a harsh punishment. And it is a punishment inflicted by drug guidelines and mandatory minimum that most federal judges believe are too harsh. In this regard, "73.7 percent of district court judges and 82.7 percent of circuit court judges [rate] drug punishments as greater than appropriate to reflect the seriousness of drug trafficking offenses." *See* USSC, *Fifteen Years of Guideline Sentencing, An Assessment of How Well the Criminal Justice System is Achieving the Goals of Sentencing Reform*, at 52. (November 2004). Moreover, "[l]ow-level, non-violent drug addicts who participate in the drug trade to support their habits are hardly the kind of individuals Congress had in mind when it directed the Sentencing Commission to promulgate the Career Offender guideline." *Newhouse*, 919 F.Supp. 2d. at 974. Instead, Congress's directive specifically targeted "drug trafficking offense[s]" involving large amounts of drugs. *Id.* (citing S. REP. NO. 98–225 at 175 (1983), 1984 U.S.C.C.A.N. 3182, 3358). Thus, sentencing Mr. Moore to the same penalties that were designed for significantly more serious offenders does not constitute just punishment. In addition, a one-size-fits-all scheme that imposes lengthy sentences indiscriminately on offenders, regardless of their culpability, does not promote respect for the law.

But the irrationality of a sentencing regime controlled by minimum mandatories is not the only injustice perpetuated by Moore's likely sentence.

Indeed, Mr. Moore's lengthy incarceration reflects the racial inequities inherent in our system of justice. In 2021, the prison population in the United States was nearly six times as large as it was 50 years ago. In the troubling reality of mass incarceration, Black Americans are imprisoned at five times the rate of whites. Ghandnoosh, N. (2023). *Ending 50 years of mass incarceration: Urgent reform needed to protect future generations,* The Sentencing Project; Carson (2022). Although black men make up 13% of the general population, they comprise 35% of the incarcerated. The Vera Institute, *An Unjust Burden* (My 2018).

> The evidence for racial disparities in the criminal justice system is well documented. The disproportionate racial impact of certain laws and policies, as well as biased decision making by justice system actors, leads to higher rates of arrest and incarceration in low-income communities of color. However, there is no evidence that these widely disproportionate rates of criminal justice contact and incarceration are making us safer.

*Id.*
    In the instant case, the Government now seeks a penalty of imprisonment, that was designed for a kingpin, against an impoverished homeless drug addict. No matter how the Government may dress it up (e.g. a vast conspiracy), the result does not achieve justice.

# Chapter 4
# Deterrence

*"No punishment has ever possessed enough power of deterrence to prevent the commission of crimes."*

Hannah Arendt, *Eichmann in Jerusalem*, Epilogue (1963)

The belief that prison sentences are effective in deterring crime is the last refuge for the misled, if not vindicative. As is the case with so many simple stories in our country (e.g. stop the steal, crack babies and the war on drugs), it is false narrative that is not supported by empirical study or evidence.[7]

*General Deterrence*

The principle of general deterrence is based on the premise that lengthy prison sentences deter crime. Not surprisingly then, federal prosecutors consistently embrace this factor in support of harsh sentences. And why wouldn't they? If you consistently assert that prison sentences are necessary to prevent future crimes, then minimum mandatories and harsh guideline sentences are entirely rationale. But the troubling aspect of the premise is not only found in its invalidity, but also in its effectuation of mass incarceration. *See* Dr. Oliver Roeder

---

[7] Limited narratives have a profound and negative impact on decision-making. *See*, *e.g.*, Dolan & Henwood, *Five Steps Toward Avoiding Traps in Narrative Decision-Making*, Nat'l Inst. of Health (Aug. 12, 2021); *see also* Akira Kurosawa, *Rashomon* (Daiei Films release on Dec. 26, 1951, in the U.S.). But born out of fear, such narratives satisfy the human desire for certainty. *See*, *e.g*, Maria Konnikova, *Why We Need Answers*, The New Yorker (Apr. 30, 2013).

et al., *What Caused the Crime Decline*?, Brennan Center for Just., 22-23 (Feb. 12, 2015). To be sure, there is no correlation between punishment and reductions in crime. *See id; see also* Gary Kleck and J.C. Barnes, *Deterrence and Macro-Level Perceptions of Punishment Risks: Is There a "Collective Wisdom"*?, 59 Crime & Delinquency 1006, 1031-33 (2013)(concluding that "increases in punishment levels do not routinely reduce crime through general deterrence mechanisms, because the fundamental link between punishment levels and perceptions of punishment levels appears to be weak to nonexistent").

A federal prosecutor's embrace of general deterrence may be comfortable, but it is hypocritical. Indeed, the Department of Justice (DOJ) has concluded that incarcerating defendants is not an effective means of deterrence. *See* U.S. Dept. of Justice, Nat'l Inst. of Justice, *Five Things About Deterrence* (July 2014). The DOJ has further found that even increasing the severity of punishment does little to deter punishment.

*Specific Deterrence*

As in the case of general deterrence, empirical evidence does not establish a relationship between sentence length and specific deterrence, regardless of the type of crime. *See* National Institute of Corrections*, Myths and Facts, Why Incarceration is Not the Best Way to Keep Communities Safe* (2016). The best available evidence establishes that imprisonment does not reduce recidivism more than noncustodial sanctions. Francis T. Cullen et al., *Prisons Do Not Reduce*

11

*Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011). Rather, there is strong evidence that prison contributes to increased recidivism. *See Criminogenic Effects of Imprisonment: Evidence from State Panel Data 1974-2002,* 6 Criminology & Public Policy 589 (2007).

> Thus, the most effective to promote public safety and ensure that convicted persons can lead law-abiding lives is through broad use of non-incarceration sentences, especially since "incarceration does little to change a person's behavior" and persons sentenced to prison have higher recidivism rates than those sentenced to community corrections.

*Myth and Facts*, at 1, 4.

## Chapter 5
## The Applicable Penalties

"*Sentence first – verdict afterwards*"

Lewis Carroll, ALICE'S ADVENTURES IN WONDERLAND, 146 (Random House 1946) (1865).

Despite the guideline sentencing range of 46 to 57 months, the minimum mandatory penalty in this case requires a sentence of 60 months. Because of this mandatory penalty, the undersigned finds himself in the untenable, if not depressing, position of asserting that a 5-year prison sentence is warranted. The difficulty of such a task lies in the fact that a 5-year prison sentence not only fails to satisfy the statute's parsimony clause, but also violates the principle of judicial discretion.

And therein lies the rub – justice cannot be achieved by sentences that are

dictated in advance by the men and women who scurry through the halls of Congress.[8] And justice cannot be achieved when federal judges are robbed of their ability "to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall v. United States*, 552 U.S. 38, 53 (2007) (quoting *Koon v. United States,* 518 U.S. 81 (1996)).

Instead of judicial autonomy, minimum mandatory penalties transfer sentencing discretion from the judiciary to the executive branch. Such a transfer is inconsistent with the separation of powers set forth in the United States Constitution. Article III of the Constitution provides the judiciary with the express authority to decide all cases and controversies. *U.S. Const. art. III, § 2*. Despite this constitutional guarantee, in the context of minimum mandatory sentencing, a judge loses his discretion to "impose a sentence that is sufficient, but not greater than necessary" to accomplish the goals of sentencing as required under 18 U.S.C. § 3553. *See United States v. Polizzi*, 549 F.Supp.2d 308, 399 (E.D. N.Y 2008)

---

[8] As C.S. Lewis wrote:

> The greatest evil is not now done in those sordid 'dens of crime' that Dickens loved to paint. It is not done even in concentration camps and labor camps. In those we see its final result. But it is conceived and ordered (moved, seconded, carried, and minuted) in clean, carpeted, warmed, and well-lighted offices, by quiet men with white collars and cut fingernails and smooth-shaven cheeks who do not need to raise their voice.

C.S. Lewis, The Screwtape Letters at xxxvii (1961 ed.).

13

(vacated and remanded *United States v. Polizzi*, 564 F.3d 142 (2d Cir. 2009).[9]

In *Polizzi*, Judge Jack Weinstein provided an insightful analysis of how prosecutorial prerogative has replaced judicial discretion in the federal world of mandatory minimum sentencing. *Id*. And how this loss of judicial discretion is hostile to the pursuit of justice in our sentencing system. *See id. See also* Justice Stephen Breyer, *Address at John F. Kennedy Law Library* (Sept. 21, 2003)(asserting that mandatory minimum sentences prevent fairness in sentencing).

Minimum mandatory sentencing effectively replaces the finite sentencing discretion of the judge with the unbounded discretion of the prosecutor. *See Polizzi,* 549 F.Supp.2d at 399. In our current federal criminal system, the prosecutor effectively decides the defendant's sentence by choosing what crime to charge.[10] *See Harris v. United States*, 536 U.S. 545, 570-71 (2002)(Breyer, J, concurring in part and concurring in the judgment). Such prosecutorial power is inconsistent with our constitution's conception of the role of a federal judge in

---

[9] In *Polizzi*, the Court granted the Defendant's motion for a new trial based on its failure to instruct the jury regarding the five-year mandatory minimum sentence that would apply if the Defendant was convicted. In *United States v. Polizzi*, the Second Circuit concluded that the district court abused its discretion in ordering a new trial based on such a failure. 564 F.3d 142, 159 (2d Cir. 2009). However, the court did not conclude, as the government urged, that a court may never instruct a jury regarding the mandatory minimum sentence. *Id*. (citing *United States v. Shannon*, 512 U.S. *Shannon*, 512 U.S. 573, 586 (1994)).

[10] Of course, a court can depart below a minimum mandatory sentence if the government files a motion under USSG § 5K1.1. This exception, however, proves the rule since the availability of either departure depends entirely on the prosecutor.

criminal sentencing. In a legal system in which mandatory minimum penalties determine the sentences, we have arrived at the absurd reality where the Queen of Heart's nonsensical conception of punishment before adjudication is realized.

Recognizing the sacrifice of judicial discretion on the altar of prosecutorial prerogative, the critical question is whether Congress was wise in placing unbridled sentencing power in the hands of the DOJ. The impact of Congressional fiat on federal sentencing has been dreadful as racial bias suffuses the minimum mandatory regime.  *See* Alllison Siegler, *End Mandatory Minimums*, Brennan Center for Just. (Oct. 18, 2021)(citing Starr and Rehavi, *Racial Disparity in Federal Criminal Sentences*, M. M. Rehavi, J. Pol. Econ. 122, no. 6, 1320-54 (2014)). "Prosecutors' mandatory minimum charges resulted in Black individuals spending more time in prison than whites for the exact same crimes." *Id*.  All else remaining equal, prosecutors have inflicted mandatory minimum penalties 65 percent more often against Black defendants. *Id*.

The shocking disparity in the use of minimum mandatories along racial lines raises significant doubt regarding our federal system of justice.[11] Regardless, one

---

[11] An oft used, but tired refrain is that the United States system of justice is the best in the world. While comforting, it will not be true unless and until our legal system shows the ability to transcend the dark undercurrents that persist in our society. *See* Alex Ross, *How American Racism Influenced Hitler*, The New Yorker (April 23, 2018).  Until then, our illusions concerning our justice system will continue to perpetuate sentences that are anything but just. *See, e.g.* Karl Marx, *A Contribution to the Critique of Hegel's Philosophy of Right* (1843)("To call on them to give up their illusions about their condition is to call on them to give up a condition that requires illusions.").

thing is certain. The imposition of a minimum mandatory penalty in Mr. Moore's case marks a solitary, but dramatic failure in such a regime.

## Chapter 6
## Conclusion

*"Midway through this life we borne upon I found myself in a dark wood where the way of truth was wholly lost and gone."*

Dante Alighieri, *La Divina Commedia, Inferno*, Canto I (1472)

As I began writing this conclusion, I was surrounded by the devastation that Hurricane Helene wrought on my home some thirty yards from the Gulf of Mexico. The storm passed a few days ago but still I stand in the muck and stench and debris left in its wake. And so as I wrote these last lines, I recognized an analogy between the brutality of Helene and the cruelty of mandatory minimum penalties. Both inflict damage indiscriminately and without remorse and both upend and destroy lives without hesitation.

But the analogy is ultimately an imperfect one - my plight will last only for a moment compared to Mr. Moore's punishment, which while not permanent, is still pretty damn long. The analogy also fails since Helene inflicted its damage on all regardless of their station in life while the harshness of mandatory penalties often targets along racial lines. Nevertheless, the analogy carries some weight since minimum mandatories also leave a foulness – an inescapable stench on our system of justice, especially in a case involving a defendant like Kareem Moore.

Putting aside the rhetorical niceties and literary pretenses, this memorandum may be nothing more and nothing less than the frustrated

mutterings of an attorney in the twilight of his career. As such, it is nothing more than the futile writings of an attorney who has grown weary of walking jail corridors through a sea of black faces. And it is nothing less than the desperate arguments of an attorney who has born witness to the imposition of unjust prison sentences in countless federal courtrooms. Despite the undersigned's best intentions, Mr. Moore may have been better served by a one sentence pleading: The Government seeks a five-year prison sentence for an indigent homeless drug addict and that ain't right.

Respectfully submitted,

*/s/ Fritz Scheller*
Fritz Scheller

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to all parties this 30th day of September 2024.

/s/ Fritz Scheller
Fritz Scheller
Florida Bar Number 183113
Fritz Scheller, P.L.
200 E. Robinson St., Ste. 1150
Orlando, Florida 32801
Telephone 407-792-1285
Facsimile 407-649-1657
Email: fscheller@flusalaw.com